## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **WESLEY EUGENE BAKER II,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:22cv00074 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **COUNSELOR ANN, et al.,** | ) | **By: Pamela Meade Sargent** |
| Defendants | ) | **United States Magistrate Judge** |
| | ) | |

The plaintiff, Wesley Eugene Baker II, ("Baker"), an inmate formerly incarcerated at the Lynchburg Adult Detention Center, ("LADC"), in Lynchburg, Virginia, and proceeding pro se, filed this civil rights action, pursuant to 42 U.S.C. § 1983, against the defendants, alleging that his rights under the Eighth Amendment to the U.S. Constitution were violated.

This case is before the undersigned magistrate judge upon transfer by consent of the parties, pursuant to 28 U.S.C. § 636(c)(1). This case is before the court on the defendants' motion for summary judgment. (Docket Item No. 24) ("Motion"). For the reasons stated below, I will grant the Motion.

### I. Facts

In his Verified Complaint, (Docket Item No. 1), Baker alleges that defendants, Counselor Ann Iniguez, ("Iniguez"),[1] and Dr. Antony Joseph, M.D., ("Dr. Joseph"), violated his Eighth Amendment rights by being deliberately indifferent to his serious

---

[1] Baker consistently refers to this defendant as "Counselor Ann."

mental health needs after he was arrested on April 17, 2021, and booked into LADC. He alleges that, shortly after being placed in his cell at LADC, he attempted suicide. According to Baker, he was placed on suicide watch, but Iniguez did not send him to the emergency department or refer him for inpatient psychiatric treatment at Western State Hospital, and he was not placed on mental health medication for more than 90 days. Additionally, Baker alleges Dr. Joseph did not schedule to see him in a timely manner, nor did he prescribe him any mental health medication despite hallucinating and hearing voices.

Thereafter, Baker filed additional evidence, which was neither sworn nor made under penalty of perjury. (Docket Item Nos. 14, 14-1.) Specifically, he alleged during the booking process, on April 17, 2021, at LADC, he was experiencing a mental health crisis, and he attempted suicide by hanging, but he was not seen by a nurse, Iniguez or Dr. Joseph until April 19, 2021. (Docket Item No. 14 at 1.) Again, Baker alleges he was not taken outside the facility for treatment or placed on mental health medication. (Docket Item No. 14 at 1.) He claims he was hallucinating, hearing voices, seeing objects that were not there, he was paranoid, and he believed the correctional officers were trying to kill him, which was a very scary situation for him. (Docket Item No. 14 at 1.) Baker further states that Iniguez saw him on her return to work on Monday, April 18, 2021,[2] and spoke to him about the state of his mental health. (Docket Item No. 14 at 1.) He claims, at that time, he was "talking out of [his] head," he showed signs of not knowing where he was, and he accused Iniguez and her boyfriend of stealing his dirt bike and going into his apartment. (Docket Item No. 14 at 1-2.) He said despite "clearly not [being] in [his] right state of mind[,]" Iniguez, nonetheless, "ignored" his mental illness and "accused" him of

---

[2] The medical records show that Iniguez saw Baker on April 20, 2021. (Docket Item No. 14-1 at 22.)

malingering, which was "totally wrong of her." (Docket Item No. 14 at 2.) According to Baker, he had been off his mental health medication for more than a year at that time "due to Covid-19," which was the cause of his mental health crisis. (Docket Item No. 14 at 2.) He claims Iniguez prevented him from getting emergency medical treatment. (Docket Item No. 14 at 2.) Baker alleges the medical files he attached showed he was suffering from schizophrenia, anxiety disorder and post-traumatic stress disorder, ("PTSD"), and Iniguez had the authority to refer him to a mental health facility where he would receive his mental health medication. (Docket Item No. 14 at 2.) Instead, according to Baker, Iniguez and Dr. Joseph ignored his mental health crisis, thereby placing him at risk of harm and causing him to suffer. (Docket Item No. 14 at 2.) In particular, Baker states it took Dr. Joseph more than six weeks to see him and place him on his mental health medications, over which time, he was in constant mental and physical pain, which could have been avoided. (Docket Item No. 14 at 2-3.) Baker alleges that, when he did see Dr. Joseph, he was placed on a fraction of the 800 mg of Seroquel he last had been prescribed by the physician at Sovah Health, and this was only after Dr. Joseph attempted to prescribe a completely different medication because the facility did not like to give Seroquel to inmates due to its expense. (Docket Item No. 14 at 3.) Dr. Joseph prescribed only 50 mg of Seroquel in the morning and 100 mg at night. This dosage, however, was later changed to 400 mg at night by Western State Hospital. (Docket Item No. 14 at 3.)

One of the medical records constituting part of this additional evidence submitted by Baker is the Mental Health Contact Note completed by Iniguez on April 20, 2021, during her initial visit with Baker. (Docket Item No. 14-1 at 22.) Iniguez noted Baker had been on suicide watch since April 18 due to reportedly making statements about wanting to harm himself and making a makeshift noose out of towels. (Docket Item No. 14-1 at 22.) Iniguez further noted Baker reportedly had

a bloody lip and knuckles, he refused to cooperate with staff instructions and had to be placed in the restraint chair for his own safety, as well as that of staff. (Docket Item No. 14-1 at 22.) She stated when the correctional officer opened the cell door slot for her to speak with Baker, he reached his arm through the slot, as if he were attempting to open the door and asking if she could open it. (Docket Item No. 14-1 at 22.) Iniguez noted that Baker asked her if someone was taking his dirt bike and putting it on the truck, he looked over her shoulder several times and stated he was speaking to "Dominique," who, according to Baker, was "the guy who is riding his dirt bike." (Docket Item No. 14-1 at 22.) Iniguez noted that Baker interrupted her several times, stating she "looks sneaky" and had "demanding questions." (Docket Item No. 14-1 at 22.) She further noted that Baker denied any suicide attempts, and he denied any prior mental health treatment or medications. (Docket Item No. 14-1 at 22.) She noted that he yelled and banged on his door several times during the session and asked her to open the cell door. (Docket Item No. 14-1 at 22.) At one point, Iniguez noted Baker got on the floor and searched for something underneath the door. (Docket Item No. 14-1 at 22.) He stated he was not in jail and that his apartment was "over there," pointing to the cell wall behind them. (Docket Item No. 14-1 at 22.) However, moments later, Baker was overheard yelling, "CO!" to one of the officers, giving the impression he was fully aware of his surroundings. (Docket Item No. 14-1 at 22.) Baker denied issues with sleep and appetite, and he stated he does nothing to cope. (Docket Item No. 14-1 at 22.) Iniguez documented that it was unclear whether Baker was actually hallucinating or simply malingering, but his presentation and behavior did not appear consistent with someone with a psychotic disorder. (Docket Item No. 14-1 at 22.) Nonetheless, due to his erratic behavior and suspicions of malingering, Iniguez continued Baker on suicide watch at that time, and she decided to continue to monitor his status and condition. (Docket Item No. 14-1 at 22.)

In support of their Motion, the defendants offered sworn Affidavits from Iniguez, (Docket Item No. 25-2, ("Iniguez Affidavit")), and Dr. Joseph, (Docket Item No. 25-1, ("Joseph Affidavit")). Various medical records belonging to Baker were attached to the Iniguez Affidavit. (Docket Item No. 25-3). In her Affidavit, Iniguez testified she is the Director of Mental Health for Mediko, Inc., a private company providing health care services to correctional facilities. (Iniguez Affidavit at 1.) At the times relevant to this case, she was a qualified mental health professional, ("QMHP"), for Mediko, providing mental health services to the inmates at LADC, and, as such, she organized the mental health treatment and programs and addressed concerns by patients and mental health providers. (Iniguez Affidavit at 1.) She also assessed the suicide risk of all the inmates and placed them on suicide watch protocols when necessary; coordinated care and treatment between patients and psychiatrists; handled crisis interventions; facilitated medication management in conjunction with the psychiatrist; conducted group counseling and limited therapy counseling; and arranged for admission to inpatient mental health facilities and hospitals when necessary. (Iniguez Affidavit at 1-2.) Iniguez stated she recalled Baker well, noting that, although she evaluated him only a few times, she responded to many of his mental health requests and grievances in her role as the onsite QMHP. (Iniguez Affidavit at 3.) According to Iniguez, Baker's allegations of a suicide attempt on April 17, 2021, are false. (Iniguez Affidavit at 3.) She saw him after LADC staff completed a "Referral to Jail Counselor" form on April 18, 2021, the purpose of which was, "Inmate Baker stated that he wanted to kill himself." (Iniguez Affidavit at 3; Docket Item No. 25-3 at 157.) She stated this form did not reference any suicide attempt, nor was she told of any suicide attempts. (Iniguez Affidavit at 3.) Iniguez stated that, per suicide watch protocol at LADC at the time, anyone could place an inmate on suicide watch, but, by virtue of her position as QMHP, she was notified each time an inmate was placed on suicide watch because

she must then evaluate the inmate within 72 hours. (Iniguez Affidavit at 3.) Iniguez stated she evaluated Baker on April 20, 2021, after being placed on suicide watch on April 18, 2021, due to his statements of intended self-harm. (Iniguez Affidavit at 3; Docket Item No. 25-3 at 3, 71, 157.) Iniguez stated she did not send Baker to the emergency room or to a mental health hospital because, based on her education, training and experience, she determined he was stable; he was not acutely suicidal; and he was not actively seeking to harm himself. (Iniguez Affidavit at 3.) Thus, he did not merit such a referral. (Iniguez Affidavit at 3.)

Iniguez stated that, although Baker's comments during the April 20, 2021, evaluation regarding someone taking his dirt bike were somewhat out of context, he still was alert and oriented and aware of who and where he was, so she was not concerned about disordered cognition. (Iniguez Affidavit at 3-4.) She stated that, although she suspected Baker was malingering, she did not express this to him because doing so does not build trust or rapport with a patient. (Iniguez Affidavit at 4.) However, she documented this observation in her notes, which she suspected Baker later read. (Iniguez Affidavit at 4.) Iniguez stated she conducted a follow-up evaluation of Baker on April 23, 2021, during which he mentioned prior diagnoses of PTSD, schizophrenia and anxiety, and he advised he had not taken previously prescribed medications for "a long time" or "8-9 months." (Iniguez Affidavit at 4; Docket Item No. 25-3 at 4.) At this time, Baker denied hallucinations or suicidal ideations, and on evaluation, he appeared paranoid, but his speech was normal, he made good eye contact, and he was alert and oriented to person, place, time and event. (Iniguez Affidavit at 4; Docket Item No. 25-3 at 4.) Based upon her evaluation of Baker, Iniguez removed him from suicide watch. (Iniguez Affidavit at 4; Docket Item No. 25-3 at 4.) However, because Baker endorsed homicidal ideations, he was placed in segregation. (Iniguez Affidavit at 4; Docket Item No. 25-3 at 4.) Iniguez

requested Baker's prior mental health records and referred him to Dr. Joseph, the psychiatrist, for further evaluation. (Iniguez Affidavit at 4; Docket Item No. 25-3 at 4.) According to Iniguez, it often took three to five months for evaluation by the psychiatrist for nonemergencies, as Dr. Joseph spent only four hours at the facility weekly. (Iniguez Affidavit at 4.)

Iniguez stated that, in response to a request by Baker for mental health attention, she evaluated him again on May 13, 2021. (Iniguez Affidavit at 4; Docket Item No. 25-3 at 66-70.) Specifically, he requested, "I need my medicine. I'm having nightmares and everything. That's about it, really. I told my lawyer I'm still hearing voices. I've already been here for a month and I still don't have my medicine. Is you the one who came to my apartment complex?" (Iniguez Affidavit at 4; Docket Item No. 25-3 at 66.) At this visit, Baker reported hearing voices, but he denied suicidal or homicidal ideation. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 67.) Iniguez noted the accounts he reported were inconsistent and that she, again, suspected malingering. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 69.) Baker presented with delusions of paranoia, but his speech was within normal limits, he made good eye contact, and he was alert and oriented to person, place, time and event. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 69.) Iniguez endorsed her prior referral of Baker to Dr. Joseph for further evaluation. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 69.)

Iniguez denies Baker's allegation that she played some role in his receipt of mental health medication or lack thereof, as Dr. Joseph, as the psychiatrist for LADC, makes all decisions regarding mental health medication type, dosage and scheduling of dosage. (Iniguez Affidavit at 5.) Iniguez stated she plays no role in that process, aside from referring the patient to Dr. Joseph for further evaluation.

(Iniguez Affidavit at 5.) However, she stated that, due to Baker's repeated requests for evaluation for mental health treatment and medication, she fast-tracked his appointment with Dr. Joseph, and he was seen only six weeks after referral, which is a much shorter wait than average for nonemergencies. (Iniguez Affidavit at 5.) Additionally, Iniguez stated that her review of Baker's mental health records revealed that Dr. Joseph evaluated him and prescribed Seroquel, the medication Baker had repeatedly requested. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 10-11.)

While Baker alleges he submitted request forms "pleading" with Dr. Joseph and Iniguez to be placed on mental health medication, Iniguez stated she reviewed these requests as part of her duties as QMHP and timely responded to each request, assuring Baker he was on the schedule to be seen by Dr. Joseph. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 139-41.) She said none of these requests went unanswered. (Iniguez Affidavit at 5.) The medical records submitted show that, on May 7, 2021, Baker wrote an Inmate Request to Iniguez, stating as follows: "Can I please get to Medical I need my mental health meds! I am starting to hear voices[. …]" (Docket Item No. 25-3 at 139.) Iniguez responded on May 10, 2021, as follows: "We will discuss at your appointment this Thursday May 13." (Docket Item No. 25-3 at 139.) Baker also sent an Inmate Request to Medical on May 6, 2021, stating, "I requested to see the DR when I was booked in about getting situated on my mental health medication[. …] Coming up on 2 ½ weeks later still no DR visit. Can someone please see to it that I get a DR visit. Please!" (Docket Item No. 25-3 at 140.) A response, dated May 8, 2021, states: "I will add you to the nurse sick call waiting list." (Docket Item No. 25-3 at 140.) On May 6, 2021, Baker sent another Inmate Request to Mental Health, stating as follows: "For 2 weeks now I have been lied to saying that I will be seen one week before last 3 then this week. I have

schizo[ph]r[e]nia, PTSD, anxiety, par[a]noia. I take Seroquel & Aprozolam [sic]. This is not a joke my lawyer wants mental health to call her ASAP. … Per my case I need my meds." (Docket Item No. 25-3 at 141.) Iniguez responded on May 6, 2021, stating, "No one can tell you when you will see mental health except for me. You are on my schedule for May 13." (Docket Item No. 25-3 at 141.) Iniguez stated Baker was admitted to Western State Hospital for a competency issue related to his criminal proceeding from September 2021 to November 2021, which was arranged by his criminal defense counsel. (Iniguez Affidavit at 5; Docket Item No. 25-3 at 13-21, 159-90.) Iniguez stated she had no interaction with Baker after December 2021 when she transitioned into her current role as the Director of Mental Health at Mediko. (Iniguez Affidavit at 6.) According to Iniguez, she never disregarded Baker's medical or mental health conditions or acted with deliberate indifference toward any of his medical or mental health needs, nor did she delay or interfere with his mental health treatment or care. (Iniguez Affidavit at 6.) Lastly, Iniguez stated she never impeded Baker's ability to receive mental health care and treatment, but, to the contrary, she timely evaluated him and made recommendations and referrals based on his symptoms and stated needs. (Iniguez Affidavit at 6.)

Dr. Joseph, in his sworn Affidavit, testified he had been a Board-eligible psychiatrist since 1978, and he had provided psychiatric services to inmate patients at various Virginia correctional facilities since 2001. (Joseph Affidavit at 1.) He said, since 2008 or 2009, he had provided psychiatric services to inmate patients at LADC. (Joseph Affidavit at 1.) Dr. Joseph stated he also continued to maintain a private clinical practice. (Joseph Affidavit at 1.) In approximately 2007, Dr. Joseph said, he began offering mental health services via telemedicine, and now conducts all mental health evaluations remotely. (Joseph Affidavit at 1.) He stated that, as a psychiatrist at LADC, he facilitates all mental health related care and concerns,

including evaluating patients, identifying mental health diagnoses when appropriate and determining the best treatment plan for each patient's mental health needs, which may include medications and/or cognitive therapies. (Joseph Affidavit at 1.) Dr. Joseph stated that, during the relevant times, he spent a total of four hours with LADC patients each week, as this was the amount of time for which the facility contracted with the medical provider for psychiatric services. (Joseph Affidavit at 3.) Each week, Dr. Joseph said, he received a list of patients, created by QMHP Iniguez, based on her previous evaluations of the patients and her assessments of their requests and grievances, who he would see during the four hours. (Joseph Affidavit at 3.) Dr. Joseph stated he played no role in responding to inmate grievances or requests for mental health care or treatment, and he was not privy to any requests Baker may have made. (Joseph Affidavit at 3.)

According to Dr. Joseph, Iniguez evaluated Baker on April 20, 2021, after he was placed on suicide watch. (Joseph Affidavit at 4; Docket Item No. 25-3 at 3, 71, 157.) Baker mentioned not being on his previously prescribed mental health medication for a long period of time. (Joseph Affidavit at 4; Docket Item No. 25-3 at 4.) Iniguez requested Baker's prior mental health records and referred him to Dr. Joseph for further evaluation. (Joseph Affidavit at 4; Docket Item No. 25-3 at 4, 8-9.) Dr. Joseph stated it often took three to five months for him to see "new" patients absent an emergency, but Iniguez kept him apprised of any concerns that required his attention during the interim. (Joseph Affidavit at 4.) Dr. Joseph stated he first saw Baker on June 6, 2021,[3] approximately six weeks after Iniguez's initial assessment and referral. (Joseph Affidavit at 4; Docket Item No. 25-3 at 10-11.) Dr.

_____

[3] The medical notes show that Dr. Joseph actually evaluated Baker three days earlier, on June 3, 2021.  (Docket Item No. 25-3 at 10-11.)

Joseph said he evaluated Baker due to his complaints of "bigger delusions and symptom exaggeration."[4] (Joseph Affidavit at 4; Docket Item No. 25-3 at 10.) According to Dr. Joseph, Baker demanded Seroquel, an antipsychotic, during this visit. (Joseph Affidavit at 4; Docket Item No. 25-3 at 10.) He stated that the records from Sovah Health indicated Baker had been prescribed 200 mg in the morning and 300 mg in the evening. (Joseph Affidavit at 4; Docket Item No. 25-3 at 10.) Dr. Joseph noted that Baker had been found to have questionable psychosis, and malingering could not be ruled out. (Joseph Affidavit at 4; Docket Item No. 25-3 at 10.) Baker denied auditory and visual hallucinations. (Joseph Affidavit at 4; Docket Item No. 25-3 at 10.) Based on Dr. Joseph's assessment, he diagnosed Baker with personality disorder, not otherwise specified. (Joseph Affidavit at 4; Docket Item No. 25-3 at 11.) Because Baker had not taken any mental health medications for the prior 12 months at that time, Dr. Joseph started him on a lower dose of Seroquel – 50 mg in the morning and 100 mg in the evening – to treat delusions. (Joseph Affidavit at 4; Docket Item No. 25-3 at 11-12.) Dr. Joseph also scheduled Baker for a re-evaluation in three months, explaining it often takes several weeks for antipsychotic medications to reach full therapeutic effect. (Joseph Affidavit at 4; Docket Item No. 25-3 at 11.)

Although Baker alleges Dr. Joseph did not want to prescribe Seroquel because it was too expensive, Dr. Joseph denies that this is true. (Joseph Affidavit at 4.) First, Dr. Joseph stated he did, in fact, prescribe Seroquel, which Baker "very emphatically demanded." (Joseph Affidavit at 4.) However, Dr. Joseph stated that, because Seroquel is an antipsychotic medication with highly addictive qualities and potential for abuse, which frequently is abused in the inmate population, he preferred to

---

[4] It appears to the court that this handwritten note actually indicates bizarre delusions. (Docket Item No. 25-3 at 10.)

prescribe similar, alternative medications for delusions. (Joseph Affidavit at 4-5.) Nevertheless, he stated he prescribed Seroquel for Baker because he had taken it previously and insisted it was the only medication that worked for him. (Joseph Affidavit at 5.)

Although Baker's follow-up visit with Dr. Joseph was scheduled for September 2021, Baker was admitted to Western State Hospital from September to November 2021 for a competency issue related to his criminal proceeding. (Joseph Affidavit at 5.) Therefore, Dr. Joseph stated he next saw Baker on December 9, 2021, shortly after his return to LADC. (Joseph Affidavit at 5; Docket Item No. 25-3 at 13-21, 159-90.) At that time, Baker advised that the providers at Western State Hospital had increased his Seroquel dosage to 400 mg, which was unsurprising to Dr. Joseph, as providers in inpatient psychiatric hospitals often prescribe higher doses of antipsychotic medications than providers in outpatient settings, like him, for maintenance follow-up doses. (Joseph Affidavit at 5; Docket Item No. 25-3 at 29.) Baker denied hallucinations and suicidal and homicidal ideations. (Joseph Affidavit at 5; Docket Item No. 25-3 at 29.) He voiced no complaints or concerns, and he said he was doing well on the increased Seroquel dosage. (Joseph Affidavit at 5; Docket Item No. 25-3 at 29.) From December 9, 2021, onward, Baker remained on 400 mg Seroquel dosage until he was released from LADC. (Joseph Affidavit at 5; Docket Item No. 25-3 at 29, 31.) Dr. Joseph stated he planned to follow up with Baker in three months. (Joseph Affidavit at 5; Docket Item No. 25-3 at 30-31.)

According to Dr. Joseph, he adjusted Baker's medications and dosages throughout 2021 and 2022 depending on his complaints and symptoms. (Joseph Affidavit at 5; Docket Item No. 25-3 at 32-39, 61-62.) He said he never disregarded Baker's medical or mental health conditions or acted with deliberate indifference

toward any of his medical or mental health needs, nor did he delay or interfere with his mental health treatment or care. (Joseph Affidavit at 5.) Lastly, Dr. Joseph stated he never impeded Baker's ability to receive mental health care and treatment, but, to the contrary, he timely evaluated him and made recommendations and referrals based on his symptoms and stated needs. (Joseph Affidavit at 6.)

Baker submitted three responses with attachments to the defendants' Motion, none of which are sworn or made under penalty of perjury. (Docket Item Nos. 29, 31, 33.) In these responses, Baker reiterates many of the same allegations and arguments. He attempts, however, to advance some additional allegations in support of his deliberate indifference claims against Iniguez and Dr. Joseph. Baker alleges that a Mental Health Followup Progress Note, dated March 17, 2022, signed by Teresa Jones, stating, "Pt attempted suicide by hanging shortly after his arrest," contradicts Iniguez's statement that Baker told a correctional officer he wanted to kill himself and constitutes evidence that both she and Dr. Joseph were deliberately indifferent to his serious mental health needs. (Docket Item No. 29-1 at 1.) Specifically, he claims that, even after they both knew of his suicide attempt, they did nothing, despite having the authority to send him to an outside facility for emergency treatment. Baker claims that Iniguez's statement that she keeps in close communication with Dr. Joseph proves he was made aware of Baker's situation, but Dr. Joseph, nonetheless, failed to take reasonable measures to decrease the risk of serious harm to him. Baker also alleges that a provider at Western State Hospital indicated his lengthy, documented mental illness history and no known documented history of malingering until his current incarceration. (Docket Item No. 29-1 at 5.) This provider further found Baker's presentation was "more consistent with the presence of schizophrenia-spectrum disorder than malingering," and she concluded his differential diagnosis included schizophrenia and schizoaffective disorder; rule

out malingering. (Docket Item No. 29-1 at 5.) For these reasons, Baker argues this provider ruled out malingering, thereby contradicting Iniguez's and Dr. Joseph's "accusations" of the same. Baker additionally points to a Mental Health Followup Progress Note, dated December 7, 2021, and signed by Dotty Spradlin, a counselor at LADC, in which Baker's diagnoses of a history of schizoaffective disorder (per previous discharge summary from Sovah Health); rule out malingering; and personality disorder, not otherwise specified, were noted. (Docket Item No. 29-1 at 7.) Baker argues this Note shows that malingering was ruled out and that the "not otherwise specified" language after the personality disorder diagnosis indicated he did not, in fact, suffer from a personality disorder. Additionally, Baker points to an April 26, 2021, medical report with an illegible signature, which includes diagnoses of schizophrenia, anxiety and PTSD, thereby contradicting Iniguez's and Dr. Joseph's "accusations" of malingering and their diagnosis of personality disorder. (Docket Item No. 33-1 at 1.)

Baker further argues that no mental health professional was on duty to screen him for mental health issues during the booking process on April 17, 2021, and no mental health staff was on duty from April 17 to April 19, 2021, to assist with his urgent mental health needs. Instead, he was placed in a restraint chair for several hours. Baker claims that Iniguez's and Dr. Joseph's failure to obtain his medical records in an urgent manner, given his suicide attempt by making a makeshift noose out of two towels, placed him in substantial risk of serious harm and constituted deliberate indifference. Baker also elaborated that, during the six-week period he was waiting to see Dr. Joseph, he suffered from hallucinations, nightmares, crying spells, loneliness, confusion and feeling lost. He also alleges that his mugshot, which he attached to his second response, and which was taken hours before he allegedly attempted suicide, "will show … how [he] was suffering from a mental health crisis."

(Docket Item No. 31 at 5.) Nonetheless, Baker claims Iniguez and Dr. Joseph "disregarded" his mugshot in denying him outside medical treatment. (Docket Item No. 31 at 5.) Baker made the following handwritten comment beside this photo, "jail photo before the suicide attempt, which shows I was in a psyc[h]otic state." (Docket Item No. 31-1 at 1.)

Additionally, Baker asks the court to disregard the Intake Inmate Screening form, completed by Officer Miller on April 17, 2021. (Docket Item No. 33.) However, he proceeds to attach this very document to his third response as an exhibit. (Docket Item No. 33-1 at 2-4.) For the most part, this Screening consisted of questions Officer Miller asked Baker, but there were some areas that asked for the officer's observations. One of the questions was: "Have you ever attempted suicide?" to which Baker answered, "No." (Docket Item No. 33-1 at 2.) Another was, "Have you recently considered committing suicide?" Again, Baker answered, "No." (Docket Item No. 33-1 at 2.) He also answered "No" to, "Are you feeling suicidal at this time?" (Docket Item No. 33-1 at 2.) Officer Miller's observations indicated "No" to "Suicidal threats." (Docket Item No. 33-1 at 2.) On a Brief Jail Mental Health Screen, Baker answered "No" to all questions, including, "Have you ever been in a hospital for emotional or mental health problems?" (Docket Item No. 33-1 at 4.) Baker questions whether Officer Miller is trained in mental health protocols or if any of the booking officers at LADC were trained in handling mental health assessments. He appears to argue that, despite his negative answers to Officer Miller's questions, Officer Miller should have examined his body for scars indicating prior suicide attempts, which he would have discovered. Baker also questions the trustworthiness of the forms, as it indicates he had never been arrested for a violent crime, when the April 17, 2021, arrest was for a violent crime.

*II. Analysis*

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. To be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.*, 93 F.3d 230, 233 (6th Cir. 1996). When a motion for summary judgment is made and is properly supported by affidavits, depositions or answers to interrogatories, the nonmoving party may not rest on the mere allegations or denials of the pleadings. *See Oliver v. Va. Dep't of Corrs.*, 2010 WL 1417833, at *2 (W.D. Va. Apr. 6, 2010) (citing FED. R. CIV. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. *See Anderson*, 477 U.S. at 256-57.

In support of the Motion, the defendants argue that there is no genuine dispute as to any material fact, and summary judgment should be entered in their favor. In

particular, both Iniguez and Dr. Joseph argue that judgment should be entered in their favor because Baker has not shown that either defendant acted with deliberate indifference to any serious risk of harm to Baker. As stated above, the court will view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to Baker. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587.

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). This includes a requirement that a state provide medical care to those it punishes by incarceration. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Godfrey v. Russell*, 2015 WL 5657037, at *8 (W.D. Va. Sept. 24, 2015) (citing *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)); *Chapman v. Rhodes*, 434 F. Supp. 1007, 1020 (S.D. Ohio 1977), *aff'd*, 624 F.2d 1099 (6th Cir. 1980), *rev'd on other grounds*, 452 U.S. 337, 344 (1981). Prisoners' rights to adequate medical care related to prisoners' physical and mental health claims are identical. *See Bowring*, 551 F.2d at 47. For a prisoner to state a constitutional claim for denial of medical care, he must demonstrate that a defendant's acts or omissions amounted to deliberate indifference to his serious medical needs. *See Estelle*, 429 U.S. at 106. Courts have recognized that "[d]eliberate indifference is a very high standard" and demonstrating mere negligence is insufficient. *Grayson v. Peed*, 195 F.3d 92, 695 (4th Cir. 1999). In essence, treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *See Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted). To establish liability under § 1983, a plaintiff must prove that the defendants "acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir.

1985). Therefore, it is insufficient to show that the prison system, generically, failed to provide adequate medical care to an inmate. In *Estelle*, the Supreme Court outlined three ways a prisoner's deliberate indifference claim related to serious medical needs may arise: 1) prison doctors' inadequate responses to the prisoner's needs; 2) guards deliberately delaying or denying access to medical attention; or 3) intentional interference with a prescribed treatment. *See* 429 U.S. at 104-05.

A prison official is deliberately indifferent if he knows of, but disregards, an inmate's serious medical need. *See Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). Therefore, liability under this standard requires two showings. First, the evidence must show that the prison official subjectively recognized a serious medical need. It is not sufficient that the official should have recognized it; the official must actually have known of it. *See Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer*, 511 U.S. at 832-35; *Sosebee v. Murphy*, 797 F.2d 179, 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978); *Rush v. Vandevander*, 2008 WL 495651, at *1 (W.D. Va. Feb. 21, 2008). Second, the evidence must show that the prison official subjectively recognized that his actions were "inappropriate in light of that risk." *Rich*, 129 F.3d at 340 n.2. It is insufficient that the official should have recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001). "[D]eliberate indifference entails something more than mere negligence, … [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Questions of medical judgment are not subject to judicial review. *See Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment do not state cognizable constitutional claims under the Eighth Amendment. *See Miltier*, 896 F.2d at 851-52; *Wright*, 766 F.2d at 849; *Estelle*, 429 U.S. at 105-06. An inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Jasper v. Mullins*, 2007 WL 3339605, at *2 (W.D. Va. Nov. 8, 2007) (quoting *Bowring*, 551 F.2d at 47-48).

In this case, the defendants argue there is no genuine dispute of material fact and that they are entitled to entry of summary judgment in their favor. The defendants do not dispute that Baker's long-standing mental health history, including diagnoses from 2006 of schizophrenia, anxiety and PTSD, constitute serious mental health needs, thereby satisfying the objective prong of the deliberate indifference standard. That being the case, the court will turn to whether Baker has met his burden of demonstrating the second, subjective prong of the deliberate indifference standard with regard to each defendant. For the following reasons, I find that he has not. I will discuss the subjective prong of Baker's deliberate indifference claim against each of the defendants in turn.

A. *Iniguez*

As stated above, Iniguez saw Baker after staff at LADC completed a "Referral to Jail Counselor" form on April 18, 2021, with the purpose of the referral being described as, "Inmate Baker stated that he wanted to kill himself." However, there is no indication in the form that Baker actually attempted to commit suicide, nor is there any other evidence that Iniguez was advised of any suicide attempts by Baker. (Iniguez Affidavit at 3.) Moreover, while Baker was placed on suicide watch by

LADC staff, per protocol, on April 18, 2021, there is no evidence in the record that an inmate is placed on suicide watch only after an actual suicide attempt. The evidence before the court shows that when an inmate, such as Baker, is placed on suicide watch, Iniguez, as the QMHP, is notified of such placement. Within 72 hours of the inmate being placed on suicide watch, she must perform a mental evaluation of the inmate. This, she did. Specifically, the undisputed evidence before the court shows that Iniguez performed her initial evaluation of Baker on April 20, 2021, which was within 72 hours of his placement on suicide watch on April 18, 2021. Iniguez's April 20, 2021, Contact Note reveals that she was aware Baker had been on suicide watch since April 18 "due to reportedly making statements about wanting to harm himself and making a makeshift noose out of towels." (Docket Item No. 25-3 at 3.) This evaluation included observations that Baker attempted to open the cell door, he asked Iniguez to open the cell door, he banged on the cell door several times, he got on the floor and "searche[d]" for something underneath the door, he stated he was not in jail and indicated his apartment was "over there," he made comments regarding someone stealing his dirt bike, he stated Iniguez looked "sneaky" and asked "demanding questions," and he reported being hospitalized several years previously at Western State Hospital. (Docket Item No. 25-3 at 3.) However, the undisputed evidence also shows that Baker denied suicide attempts, as well as prior mental health treatment and medications, to Iniguez and he was overheard yelling, "CO!" to one of the officers, indicating he was fully aware of where he was. (Docket Item No. 25-3 at 3.) Given these circumstances, Iniguez noted it was unclear whether Baker was actually hallucinating or simply malingering, but she further noted that his presentation and behavior did not appear consistent with someone with a psychotic disorder. (Docket Item No. 25-3 at 3.) In her Affidavit, Iniguez explained that, after evaluating Baker, she determined that, based on her training, education and experience, he was stable; he was not acutely suicidal; and he was not actively

seeking to harm himself, regardless of whether he had an actual suicide attempt or simply made a self-harm statement on April 17, 2021. (Iniguez Affidavit at 3.) Thus, her evaluation of Baker did not merit sending him to an outside facility for emergency mental health treatment. (Iniguez Affidavit at 3.) Nonetheless, given his erratic behavior, Iniguez reasonably decided to keep Baker on suicide watch at that time to monitor his progress. (Docket Item No. 25-3 at 3.) Despite Baker's unsworn allegations that Iniguez "accused" him of malingering, in her Affidavit, Iniguez stated that she never expressed her suspicions of malingering to him, and her treatment note shows that she did not disregard his needs due to those suspicions. (Iniguez Affidavit at 4.)

Next, despite Baker's unsworn claim that there was no mental health professional on duty during his booking into the facility on April 17, 2021, he did provide a document to the court which shows that he underwent an intake screening process, during which his mental health needs were assessed by Officer Miller. At that time, however, he denied having any mental health concerns, either currently or previously. (Docket Item No. 33-1 at 2-4.) Although Baker questions the mental health training of Officer Miller, it appears that all Miller was required to do was ask questions of Baker that were included on the form and record any relevant observations. In this instance, Baker answered all questions relating to mental health issues in the negative. Nonetheless, the court has no evidence before it showing that Officer Miller's mental health training, or lack thereof, was relevant to whether Iniguez was deliberately indifferent to Baker's serious mental health needs.

Baker alleges that he made repeated requests for evaluation for mental health treatment and medication, which were ignored by Iniguez. Iniguez does not dispute that Baker made such repeated requests. However, she has provided evidence

showing that she responded to Baker's requests and fast-tracked Baker's appointment with Dr. Joseph. The evidence shows that Baker first saw Dr. Joseph on June 3, 2021, approximately six weeks after his first evaluation with Iniguez. Baker claims that six weeks is too long to wait to see a psychiatrist for mental health treatment and medication. However, as Iniguez states in her Affidavit, this six-week wait to see Dr. Joseph was a much shorter wait than the three- to five-month average to see the psychiatrist for nonemergencies. (Iniguez Affidavit at 5.) Thus, Iniguez's action of fast-tracking cut Baker's wait time to see Dr. Joseph from three to five months down to six weeks. This is not the action of someone who is being deliberately indifferent to someone's serious mental health needs. The court further notes that, while six weeks might seem like a long time to Baker, the evidence shows that Dr. Joseph spends only four hours weekly treating LADC inmates, as this is what he has been contracted to do. Therefore, for him to see Baker within six weeks was not a long period of time under these circumstances. Moreover, Iniguez's fast-tracking of Baker's appointment further shows that she, in fact, did monitor Baker's symptoms and that she referred him for the mental health treatment he requested.

Next, while Baker attempts to use an April 26, 2021, "Medical History And Physical Examination" form, completed by a nurse and the onsite physician at LADC, which indicates a history of diagnoses of schizophrenia, anxiety and PTSD, in an effort to show this contradicts Iniguez's "accusation" of malingering, thereby showing deliberate indifference to his serious mental health needs, the court disagrees. First, as the defendants note, this examination was not completed by and the form was not signed by Iniguez. Additionally, it was created subsequent to two of Iniguez's evaluations of Baker – on April 20 and April 23, 2021. Moreover, these diagnoses are included in the "History" section of the form, which asks the patient to describe any "Yes" answers. Baker had indicated "Yes" to having a history of

"Emotional/Nervous Disorders," which he explained as being these diagnoses. Thus, this section includes information provided to medical staff by Baker himself. The medical notes show that, on April 23, 2021, Baker revealed these prior diagnoses to Iniguez. That being the case, there is no contradiction, as alleged by Baker. Furthermore, even if Baker had been diagnosed with schizophrenia, anxiety and PTSD at some point in the past, that does not mean that Iniguez's suspicions of malingering on April 20, 2021, constitute deliberate indifference to his serious mental health needs. For reasons already stated, Iniguez's evaluation of Baker's mental status on April 20, 2021, led her to reasonably suspect he might be malingering at that time. Despite these suspicions, however, Iniguez rendered reasonable mental health treatment to Baker. Thus, her actions did not constitute deliberate indifference.

For all these reasons, the court finds that Baker has failed to produce any evidence that Iniguez ignored a serious mental health need with the knowledge that doing so was inappropriate in light of a substantial risk of serious harm to Baker. Specifically, the undisputed evidence before the court shows that Iniguez timely evaluated Baker and fast-tracked his appointment with Dr. Joseph. Baker does not agree with Iniguez's treatment, in that she failed to send him for outside emergency treatment or inpatient psychiatric treatment. However, it is well-settled that Baker's disagreement with Iniguez's treatment decisions is insufficient to state a claim of deliberate indifference, as questions of medical judgment are not subject to judicial review. *See Russell*, 528 F.2d at 319. For all the reasons stated herein, Baker has failed to show that Iniguez's actions were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851.

*B.  Dr. Joseph*

As stated herein, it often took three to five months for Dr. Joseph to see "new" patients, absent an emergency. (Joseph Affidavit at 4.) However, he first evaluated Baker six weeks after being placed on his evaluation list by Iniguez. (Joseph Affidavit at 4.) During this six-week period, Dr. Joseph obtained and reviewed Baker's prior medical records, which, by themselves, did not indicate that Baker required immediate mental health intervention. Furthermore, according to Dr. Joseph, at no time during this six-week period did Baker's symptoms or concerns require a physician's examination or emergent intervention. He stated Iniguez continued to monitor Baker, and she ensured that his symptoms did not worsen until he saw him on June 3, 2021. (Joseph Affidavit at 4.) Dr. Joseph noted he evaluated Baker due to complaints of delusions and symptom exaggeration. However, Baker denied auditory and visual hallucinations. (Joseph Affidavit at 4.) While it is undisputed that Baker has a prior mental health history, Dr. Joseph is required to prescribe appropriate treatment based on a patient's then-current complaints and symptoms. Among the mental status findings on June 3, 2021, were that Baker was alert and well-groomed, with fluent and coherent speech, and he had a euthymic mood and logical and linear thought process. He also denied current suicidal plans or intentions and homicidal ideation. (Docket Item No. 25-3 at 10.) Baker was noted to be uncooperative and hostile, with psychomotor agitation, pressured speech focusing only on his preferred medication, and he had paranoia. (Docket Item No. 25-3 at 10.) Given these findings, Dr. Joseph reasonably concluded there was no reason to refer Baker for outside emergency treatment or for inpatient psychiatric treatment.

Although Baker alleges the adjustment in his Seroquel dosage constitutes deliberate indifference, it is undisputed that he had not taken any mental health medications for more than 12 months when he saw Dr. Joseph. (Joseph Affidavit at 4; Docket Item No. 25-3 at 10.) Thus, Dr. Joseph stated he started Baker on a lower dose of Seroquel – 50 mg in the morning and 100 mg in the evening – to treat his current symptoms. (Joseph Affidavit at 4; Docket Item No. 25-3 at 11-12.) Dr. Joseph scheduled Baker to be re-evaluated in three months, noting that it often took several weeks for antipsychotic medications, such as Seroquel, to reach full therapeutic effect. (Joseph Affidavit at 4; Docket Item No. 25-3 at 11.) He stated that his prescribing this dosage of Seroquel had nothing to do with the drug's cost, but with its addictive nature. (Joseph Affidavit at 4-5.) According to Baker, the providers at Western State Hospital increased his Seroquel dosage, which, Dr. Joseph stated was unsurprising, as providers in inpatient psychiatric hospitals often prescribe higher medication doses than providers in outpatient settings, like him, for maintenance follow-up doses. (Joseph Affidavit at 5.) Dr. Joseph concedes that Baker remained on the Seroquel dosage set at Western State Hospital for the remainder of his stay at LADC, as he voiced no complaints and was doing well on the dosage. (Joseph Affidavit at 5; Docket Item No. 25-3 at 29, 31.) Specifically, when he saw Baker on December 9, 2021, shortly after he returned to LADC from Western State Hospital, Baker denied hallucinations, he was alert, well-groomed and cooperative, with appropriate behavior, he had coherent, but unfocused speech, he had an anxious mood and a flat affect, as well as loosening of associations, and he denied current suicidal plans or intentions and homicidal ideation. (Docket Item No. 25-3 at 29.) There is no evidence that Dr. Joseph saw Baker after this date.

Baker further argues that, because a provider at Western State Hospital documented in his discharge summary that malingering was ruled out, finding

Baker's symptoms were more consistent with schizophrenia, this showed Dr. Joseph was deliberately indifferent. (Docket Item No. 29 at 2-3.) The court disagrees. I first find that Baker simply is incorrect that malingering was ruled out. Instead, the provider noted the *need* to rule out malingering. Moreover, even if the provider had ruled out malingering, this finding would have been relevant only to that particular date, not a previous date. As the defendants argue, just because Dr. Joseph formed one provisional diagnosis on one date, while another physician formed another, different diagnosis on a later date, does not necessarily lead to the conclusion that Dr. Joseph was deliberately indifferent. Similarly, with regard to Baker's argument that the April 26, 2021, examination note, indicating prior diagnoses of schizophrenia, anxiety and PTSD, ultimately shows deliberate indifference by Dr. Joseph, who "accused" him of malingering, the court disagrees. As with Iniguez, Dr. Joseph neither examined Baker on this date, nor did he sign this note. Additionally, on June 3, 2021, Dr. Joseph assessed Baker's then-current symptoms, diagnosing a personality disorder, not otherwise specified. As stated herein, just because Dr. Joseph formed a diagnosis on one date, which differs from a diagnosis made by a physician on an earlier date, does not necessarily mean Dr. Joseph is deliberately indifferent to serious mental health needs.

For all these reasons, the court finds that Baker has failed to produce any evidence that Dr. Joseph ignored a serious mental health need with the knowledge that doing so was inappropriate in light of a substantial risk of serious harm to Baker. Specifically, despite Baker's allegations that six weeks was too long to wait to see Dr. Joseph, the court finds that Dr. Joseph did not delay or interfere with Baker's mental health treatment. Furthermore, Dr. Joseph exercised his sound medical judgment as a psychiatrist when he evaluated Baker and prescribed a lower dose of Seroquel, the antipsychotic medication Baker demanded. Although Baker might

disagree with Dr. Joseph's medical decision to place him on this lower dose, given that he had been off the medication for more than a year, this does not constitute deliberate indifference to Baker's serious mental health needs. Likewise, Dr. Joseph's evaluations of Baker did not indicate any reason to refer him to an outside emergency room or psychiatric hospital, as Baker never exhibited suicidal or homicidal thoughts or behaviors. As stated above, although Baker might disagree with Dr. Joseph's evaluation and treatment of his mental health condition, this is insufficient to state a claim of deliberate indifference. *See Russell*, 528 F.2d at 319 (mere disagreements between an inmate and medical staff regarding medical treatment do not state a claim, as questions of medial judgment are not subject to judicial review).

Based on the above-stated reasons, I will grant the Motion and enter summary judgment in the defendants' favor on Baker's Eighth Amendment claims.

An appropriate Order and Judgment will be entered.

DATED: March 31, 2023.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE